UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| PLASTIC SURGEONS OF LEXINGTON, PLLC, | ) ) ) |
| Plaintiff, | ) ) No. 5:20-CV-258-REW-EBA |
| v. | ) ) ) |
| LIBERTY MUTUAL INSURANCE COMPANY and OHIO SECURITY INSURANCE COMPANY, | ) OPINION & ORDER ) ) ) ) |
| Defendants. | ) |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendant Ohio Security Insurance Company moves for partial summary judgment on the issue "of whether the insurance policy covers the claim for lost business income of Plaintiff Plastic Surgeons of Lexington, PLLC ("Plaintiff" or "Surgeons"). DE 27 at 1. Plaintiff responded, DE 28, and Defendant Ohio Security replied, DE 29. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). *See also* DE 22 (Order Denying Motion to Remand).

I.  **Background**

Plastic Surgeons is, as its name suggests, a physicians' office in Lexington, Kentucky. DE 1-1 at 5 (State Court Complaint ¶ 3). Defendants are insurance companies licensed to issue policies in the Commonwealth of Kentucky. *Id.* (Compl. ¶¶ 4–6). Plastic Surgeons was covered under a Commercial Insurance Policy, issued by Defendant Ohio Security,[1] covering the period between

---

[1] As in the Court's order at DE 22, it is still not clear whether Liberty Mutual is a proper party, but resolution of Liberty Mutual's status is not necessary to resolution of the motion. Ohio Security, on the papers, was the insuring entity.

1

June 19, 2019 and June 29, 2020. *Id.* at 6 (Compl. ¶ 9). In early 2020, due to the COVID-19 pandemic and associated actions taken by state government to slow the spread of the virus (specifically, a bar on elective surgical procedures), Plastic Surgeons ceased elective procedures (the bulk of its business) for a period of time and suffered losses as a result. *Id.* at 9–10 (Compl. ¶¶ 17–23). Plastic Surgeons filed this action in Fayette Circuit Court, asserting claims against Defendants Ohio Security and Liberty Mutual Insurance for declaratory judgment, breach of contract, violation of Kentucky's Unfair Claims Settlement Practices Act (KRS § 304.12-130, *et seq.*), common law bad faith, and violation of Kentucky's Consumer Protection Act (KRS § 367.110, *et seq.*). *Id.* at 11–16 (Compl. ¶¶ 30–74). In a nutshell, Plastic Surgeons asserts that the policy should cover and indemnify it for business losses associated with the state closure order, which ran through late May 2020; the insurer, Ohio Security, denied the claim. Plaintiff sued on the contract and pleaded various extracontractual theories recognized under Kentucky law. After abstention jousting, Defendant Ohio Security then filed the instant motion. DE 27.

## II. Relevant Contract Provisions

The Court highlights the following contract language from the operative Policy BZS(20)52262750, DE 1-1 Complaint ¶ 9, as specifically indicated by the parties:

### a. Business Income Coverage:

"We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'. The suspension **must be caused by direct physical loss of or damage to property at the described premises.** The loss or damage

2

**must be caused by or result from a Covered Cause of Loss.**[2] *See* DE 1-1, at 60 ("Policy"), Section (I)(A)(5)(f)(1)(a) (emphasis added).

"We will only pay for loss of Business Income that you sustain during the 'period of restoration' and that occurs within 12 consecutive months after the date of direct physical loss or damage. We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage, unless a greater number of days is shown in the Declarations." *Id.* at Section (I)(A)(5)(f)(1)(b). "Business Income means the . . . Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred . . . ." *Id.* at Section (I)(A)(5)(f)(1)(c)(i).

The "period of restoration" mentioned in the previous section "means the period of time that . . . begins 24 hours after the time of **direct physical loss or damage caused by or resulting from any Covered Cause of Loss** at the described premises" and ends "on the earlier of . . . the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or . . . [t]he date when business is resumed at a new permanent location." *Id.* at Section (I)(H)(9)(a)(1)-(2) (as modified by Endorsement Form BP 88 16 06 09 OSI 000173) (emphasis added).

### b.  Civil Authority Coverage

"When a **Covered Cause of Loss** causes **damage to property** other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary

---

[2] The Covered Cause of Loss provision means "direct physical loss unless the loss is excluded or limited under Section I[.]" This concept is the lynchpin of the overall property coverage: "We will pay for direct physical loss of or damage to Covered Property at the premises . . . caused by or resulting from any Covered Cause of Loss."  Section 1.A.1 and 1.A.3.

3

Extra Expense caused by action of civil authority that **prohibits access** to the described premises, provided that both of the following apply:

> (1) Access to the area immediately surrounding the damaged property is **prohibited** by civil authority **as a result of the damage**, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property."

*Id.* at Section (I)(A)(5)(i)(1)-(2).

### c. Business Income from Dependent Properties Coverage

The Policy further provides that Ohio Security "will pay for the actual loss of Business Income you sustain due to physical loss or damage at the premises of a dependent property or secondary dependent property **caused by or resulting from any Covered Cause of Loss**." *Id.* at Section (I)(A)(5)(m) (as modified by Endorsement Form BP 79 19 09 16) (emphasis added). The Policy then defines "dependent property." *See id.*

### d. Relevant Exclusions

"We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area." *Id.* at Section (I)(B)(1).

The Policy then lists several categories of exclusions. Relevant here, is subsection (j): "(1) [a]ny virus, bacterium or other microorganism that induces or is capable of inducing physical

4

distress, illness or disease. *Id.* Section (I)(B)(1)(j). Also relevant here is the exclusion stating "[w]e will not pay for loss or damage caused by or resulting from any of the following: . . . Delay, loss of use or loss of market." *Id.* at Section (I)(B)(2)(b) ("The Consequential Losses Exclusion").

### e. Property Damage

Under a section titled "Liability and Medical Expenses Definitions," the Policy provides that "Property damage" means: "(a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." *Id.* at Section (II)(F)(17)(a)-(b).

### III. Legal Standards

### a. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'

which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.") (emphasis omitted).

This setting presents questions about policy language, rather than about disputed underlying facts. Neither side suggests a contest over the raw facts in the case; rather, the parties disagree over whether the Policy applies to Plaintiff's business losses resulting from the pandemic-related state restrictions on elective surgeries.

### b. Kentucky Law

The parties agree that Kentucky law applies to the interpretation of the Policy at issue. *See* DE 27 at 13; DE 28 at 7. In Kentucky, "'the construction of insurance contract provisions comprise questions of law for the court, *unless* disputed facts are involved.'" *Hanover Ins. Co. v. American Engineering Co.*, 33 F.3d 727, 730 (6th Cir. 1994) (citing *Perry's Adm'x v. Inter-Southern Life Ins. Co.*, 71 S.W.2d. 431, 433 (Ky. 1934)) (emphasis in original); *see also Foreman v. Auto Club*

6

*Prop.-Cas. Ins. Co.*, 617 S.W.3d 345, 349 (Ky. 2021). Per *Foreman*, interpretation "of insurance contracts is a matter of law," and courts enforce as written terms that are "unambiguous and not unreasonable." *Foreman*, 617 S.W.3d at 349. Kentucky law places the burden "on the beneficiary to establish accordingly, by some evidence, his right to recover." *See N. Am. Accident Ins. Co. v. White*, 80 S.W.2d 577, 578 (Ky. 1935). Unambiguous contract terms are interpreted by looking only to "the four corners of the document to determine the parties' intentions." *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 695 (Ky. 2016) (internal citations omitted). "Where there is no ambiguity, the rule of liberal construction in favor of the insured is inapplicable." *Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon*, 15 S.W.3d 626, 633 (Ky. 2005). "A non-existent ambiguity should not be utilized to resolve a policy against an insurer. It is not enough for one party to claim ambiguity. The mere fact that a party attempts to muddy the water and create some question of interpretation does not necessarily create an ambiguity." *Id.* at 633-34 (cleaned up) (internal citations omitted). Where a true ambiguity exists, "ambiguous terms are to be construed against the drafter and in favor of the insured . . . ." *Id.* (internal citations omitted). However, "we must also give the policy a reasonable interpretation, and there is no requirement that every doubt be resolved against the insurer." *Id.* (cleaned up) (internal citations omitted). Where not defined in the policy, or not fully defined, contracts terms "should be interpreted in light of the usage and understanding of the average person." *Stone v. Kentucky Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 810-11 (Ky. 2000) (citing *Fryman v. Pilot Life. Ins. Co.*, 704 S.W.2d 205 (Ky. 1986)). Ultimately, "we consider what could be reasonably expected by the insured from the plain contract language, as it is controlling." *Foreman*, 617 S.W.3d at 349.

### IV. Analysis

The Court begins by noting that no party raises the existence of a genuine dispute of material fact. The matter concerns only the appropriate interpretation of the relevant contract provisions and is properly resolved on a motion for summary judgment. *See, e.g.*, FED. R. CIV. P. 56(a).

### a. "Covered Cause of Loss"

The Court reads all relevant contract provisions to require, as an initial matter, the existence of a "Covered Cause of Loss" to trigger coverage. *See, e.g.*, Policy, Section (I)(A)(5)(f)(1)(a) ("When a Covered Cause of Loss causes damage to property . . . ); Section (I)(A)(5)(f)(1)(a) ("The loss or damage must be caused by or result from a Covered Cause of Loss."). The Policy characterizes "Covered Cause of Loss" as "Direct physical loss unless the loss is excluded or limited under Section 1- Property." *Id.* at Section (I)(A)(3). So, for a loss to be covered it must be a "direct physical loss."

The Policy does not further define "direct physical loss" or any of those individual words. And neither party cited a Kentucky case defining any of these terms. A torrent of pandemic-initiated case law informs this area. Contrary to Plaintiff's assertions, its definition of "direct physical loss" is not reasonable. The Court notes at the outset that "direct physical loss" is not ambiguous. *See Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 405 (6th Cir. 2021) (finding nearly identical language unambiguous under Ohio law: "It refers to direct physical loss of property, not the inability to use property."). The Court thus looks to the ordinary and plain meaning of the phrase. *See Stone*, 34 S.W.3d at 810-11. "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . stemming immediately

from a source . . . characterized by close logical, causal, or consequential relationship."[3] "Physical" is defined as "having material existence . . . perceptible especially through the senses and subject to the laws of nature."[4] "Loss" is defined as "the partial or complete deterioration or absence of a physical capability or function . . . destruction, ruin . . . ."[5] So, a "direct physical loss" is partial or complete damage or ruin that is material or tangible and that results from a perceptible and immediate cause.

Several other courts have held as such. *See, e.g.*, *Estes v. Cincinnati Ins. Co.*, 23 F.4th 695, 699-700 (6th Cir. 2022) (finding, in a Kentucky law case that parallels this case: "The phrase 'physical loss' would convey to the 'average person' that a property owner has been tangibly deprived of the property or that the property has been tangibly destroyed."); *Universal Image Producs., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 573 (6th Cir. 2012) (finding "direct physical loss" is most reasonably read to require "tangible damage"); *Bluegrass Oral Health Ctr., PLLC v. Cincinnati Ins. Co.*, No. 1:20-CV-00120-GNS, 2021 WL 1069038, at *4 (W.D. Ky. Mar. 18, 2021) ("'physical loss'" would mean destruction or ruin produced by forces or operation of physics"); *see also Brown Jug, Inc. v. Cincinnati Ins. Co.*, No. 21-2644, 2022 WL 538221, at *3 (6th Cir. Feb. 23, 2022) (finding in a COVID-19, business loss case, under Michigan law: "Accordingly, giving the words 'direct physical loss' their ordinary meaning, we find that plaintiffs must show destruction or alteration of the property, or dispossession from the property, to recover under their insurance policies.").

---

[3] "Direct, *adj*.", MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/direct, (last visited Jan. 18, 2022). The cases regularly resort to dictionary references to find common, ordinary meaning. *See, e.g.*, *Estes*, 23 F. 4th at 700 ("dictionaries confirm").
[4] "Physical, *adj*.", MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/physical, (last visited Jan. 18, 2022).
[5] "Loss, *n*.", MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/loss, (last visited Jan. 18, 2022)

9

Ohio Security advocates for a similar definition and asserts that "[t]he ordinary meaning of 'direct physical loss or damage' necessarily requires immediate and material deprivation of or harm to tangible property." DE 27 at 14. Plaintiff contests this and argues that "direct physical loss" includes impaired or lost use of the property, even absent physical damage. DE 28 at 10-11; 12 ("loss of use of the property is sufficient to trigger coverage"). Plaintiff's arguments are unconvincing.

In support of its conclusion that "direct physical loss" includes property rendered uninhabitable, Plaintiff cites several out-of-circuit cases that describe physical forces or elements acting on insured property to render them uninhabitable. *See, e.g.*, *Port Auth. Of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (finding large quantities of asbestos in a building made the structure uninhabitable and resulted in direct physical loss); *Prudential Prop. & Cas. Co. v. Lillard-Roberts*, CV-01-1362-ST, 2002 WL 31495830, at *9 (D. Or. June 18, 2002) (finding there may be "direct physical loss" where property is "rendered uninhabitable by mold"). Even if the Court were to accept that such uninhabitability, without physical alteration or damage, may result in direct physical loss (as tangible deprivation) in some circumstances, these cases are materially different from the situation at Plaintiff's office. First, Plaintiff affirmatively denies that any actual contamination or infection occurred at the insured property. DE 28 at 18. And COVID-19 presence surely is different in kind from asbestos or mold. Further, Plaintiff does not allege that the property was uninhabitable; indeed, Surgeons had control over and access to its offices throughout the entire period. The state order simply restricted the scope of allowed non-emergent activities at medical sites. Plaintiff merely alleges that it was unable to *fully utilize* the property for its intended purpose. *Id.* at 13. It concedes that the property was either fully or partially open for 32 days during the 51-day period of government restrictions.

*Id.* at 2. Plaintiff presents no facts to suggest that at any point Surgeons was unable to enter or access its own property—the property had regulated use, but it was not rendered uninhabitable.

Several courts have rejected Plaintiff's specific argument that "direct physical loss" includes loss of use due to COVID-19 restrictions. *See, e.g.*, *1210 McGavock Street Hospitality Partners, LLC v. Admiral Indemnity Co.*, 509 F.Supp.3d 1032, 1042-43 (M.D. Tenn. 2020) (finding, under Tennessee law, that executive order forcing restaurant to operate at limited capacity due to COVID-19 did not constitute "direct physical loss"); *SFDG LLC v. Cincinnati Ins. Co.*, No. 1:20-cv-237, 2021 WL 4057573, at *6 (E.D. Tenn. Aug. 31, 2021) (finding, under Tennessee law, executive order barring non-emergency dental procedures due to COVID-19 did not result in "direct physical loss" and rejecting Plaintiff's argument that "direct physical loss" includes loss of use); *Santo's Italian Café*, 15 F.4th at 401 (finding, under Ohio law, that a restaurant's partial closure due to COVID-19 restrictions was not a "direct physical loss" because "[t]he restaurant has not been tangibly destroyed, whether in part or in full"); *Dakota Girls, LLC v. Philadelphia Indemnity Ins. Co.*, 524 F.Supp.3d 762, 770-71 (S.D. Ohio 2021) (finding, under Ohio law, government directive requiring a preschool to shut down due to COVID-19 did not constitute "direct physical loss").

*Estes* essentially ends this inquiry. There, the Court addressed a dentist's claim that government restrictions prompted by COVID-19 triggered income protection under a "direct physical loss" policy. The policy language and mechanics mirrored those here, and Kentucky law applied. The Court determined that the key phrase means "that a property owner has been tangibly deprived of the property or that the property has been tangibly destroyed." *Estes*, 23 F. 4th at 700. COVID-19 "did not destroy [claimant's] dental offices, and the government shutdown orders [which barred non-emergent care] did not dispossess it of them[.]" *See id.* Estes claimed only

"economic" or "business" losses, which did not qualify: "[A] covered source itself must destroy covered property or deprive the property's owner of possession . . . If, by contrast, a source causes an owner to suffer only a 'detrimental economic impact' without a tangible destruction or deprivation of property, that intangible or economic harm does not suffice." This is Surgeons' precise Policy situation.

The Court is far more convinced by the host of courts finding "direct physical loss" not to include loss of use than by Plaintiff's thin arguments. It is possible that a direct physical loss could result in a loss of use, for example if the insured property was burned to the ground—this is a direct physical loss, and the insured party has suffered a loss of use. However, a loss of use will not always be accompanied by a direct physical loss, as in this case, where Plaintiff surely lost *some use* of its property, yet the property suffered no *direct physical* loss and Plaintiff was not tangibly dispossessed. *See Santo's Italian Café*, 15 F.4th at 404 ("If we . . . construed any loss of *use* to be a physical loss of property, that would create problems of its own.") (emphasis in original). Surgeons was able to access and enter its property at all times. Even accepting the point that loss does not necessarily indicate permanent loss, Plaintiff has not alleged any physical loss, permanent or not. Finding a direct physical loss is a predicate to coverage. The Policy, as *Estes* noted, is property, not profit, insurance. *Estes*, 23 F.4th at 700.

### b. Property Damage Provision

Plaintiff, in a somewhat cursory fashion, points to a stray "property damage" provision of the Policy in support of its definition of "direct physical loss" and its claim for coverage. DE 28, at 12. "'Property damage' means: (a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) Loss of use of tangible property that is not physically injured." Policy, Section (II)(F)(17)(a)-(b). At first glance, this section does include lost use, without physical

12

injury, as within the Policy conception of damage. However, when read in context, it is clear that this provision is in reference to third-party liability, as Ohio Security points out. *See* DE 29 at 9. The section in which this provision is listed, Section II, is titled "Liability" and provides that "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies." Policy, Section (II)(A)(1)(a). The definitions portion of Section II then contains the provision describing "property damage" above. A plain reading of this section in context reveals that the property damage section that Plaintiff cites applies only to the term "property damage" as it used in this liability section. *See Harrow Products, Inc. v. Liberty Mut. Ins. Co.*, 65 F.3d 1015, 1023 (6th Cir. 1995) (approving propriety of interpreting insurance provisions in context of the entire policy). Indeed, the sections under which Plaintiff claims coverage do not pertinently use the defined term "property damage." The definition itself segregates and augments "physical" injury, a distinct component in the salient Property coverage here addressed. This provision provides no support for Plaintiff's argument and does not serve as a basis for coverage.

### c. Civil Authority and Business Income Coverage

The Civil Authority provision provides, in relevant part, that "[w]hen a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises . . ." Policy, Section (I)(A)(5)(i)(1)-(2).

Surgeons asserts that the executive order prohibiting non-emergent, non-urgent in person procedures were civil authority orders. The Court, and the parties, agree on this preliminary point. However, Plaintiff then argues that "the threat of and the actual presence of COVID-19 caused by the pandemic [ ] is a dangerous physical condition that damages the property surrounding insured's property." DE 28 at 17. The Court's established understanding of "direct physical loss" does not

13

permit the conclusion Plaintiff seeks. Recall that a "Covered Cause of Loss," which imports "direct physical loss," must be the damage catalyst. Plaintiff has not alleged facts that establish tangible harm or damage to any of the properties near its own—the general threat and presence of COVID-19 is not enough, as already discussed. Further, the provision requires that civil authority "prohibit," not merely regulate or limit, access to insured premises. Thus, even if the Court accepts Plaintiff's point that the civil authority orders limited its access to the premises, this would still not trigger coverage under this provision. *See Bluegrass Oral Health*, 2021 WL 1069038, at *5 (applying similar policy language and concluding that "[t]he 'Civil Authority' coverage sought by [Plaintiff] requires a claim for a tangible loss to property other than the insured property, which [Plaintiff] has failed to identify").

Neither can Plaintiff point to any facts that would trigger coverage under the Business Income provision. This provision states that "[w]e will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'. The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss." Policy, Section (I)(A)(5)(f)(1)(a).

Once again, the lynchpin concept, direct physical loss, dooms the dependent theory. Plaintiff has alleged no facts that could reasonably establish direct physical loss of or damage to its property. *See Santo's Italian Café*, 15 F.4th at 404 ("Ohio's prohibition on indoor dining no doubt caused an economic loss for Santo's Café. But it did not cause a direct, physical loss of property, which is a precondition for the business suspension coverage in the policy and in fact for most coverage in the policy."). Further supporting the Court's position is the language indicating a "period of restoration." The Policy provides that the "period of restoration" ends "when the

14

property at the described premises should be **repaired, rebuilt or replaced** with reasonable speed and similar quality; or . . . [t]he date when business is resumed at a new permanent location." Policy, Section (I)(H)(9)(a)(1)-(2) (as modified by Endorsement Form BP 88 16 06 09 OSI 000173) (emphasis added). The Policy does not further define restoration. "Restoration" means "an act of restoring or the condition of being restored such . . . a restoring to an unimpaired or improved condition . . . something that is restored."[6] Taking all these terms in context and with their plain and ordinary meaning, the Business Income provision applies when there is direct physical loss or damage that necessitates some repair, replacement, or rebuilding. Surgeons offers a strained and unreasonable example of how the COVID-19 restrictions could result in restoration, a hypothetical that the Court does not accept. *See* DE 28 at 15 ("If, for example, the coronavirus risk could be minimized by the installation of partitions and a particular ventilation system, then Plastic Surgeons would be expected to 'repair' the space by installing those safety features."). This is a far cry from meeting Plaintiff's burden to "identify specific facts in the record raising a genuine issue for trial in order to defeat the motion for summary judgment." *Stiles ex rel. D.S. v. Grainger Cty. Tenn.*, 819 F.3d 834, 847 (6th Cir. 2016) (citing *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986)). *Estes* expressly held that a like "period of restoration" provision logically fortified the view that direct physical loss "requires the tangible destruction or deprivation of property." *Estes*, 23 F.4th at 701. Without that, *i.e.*, something to repair or replace, "how should courts determine the 'period of restoration?'" *Id.*

      Surgeons also posits that the Policy language in the Business Income provision covering direct physical loss *of* rather than *to* property is somehow significant. Plaintiff offers little analysis

---

[6] "Restoration, *n.*", MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/restoration, (last visited Jan. 18, 2022).

15

on this point and the cases cited provide no stronger support. *See Source Food Tech., Inc. v. U.S. Fidelity and Guar. Co.*, 465 F.3d 834, 838 (8th Cir 2006) (noting, in dicta, without analysis, that loss "of property" as opposed to "to property" might have resulted in the court finding coverage proper); *Turek Enterp., Inc. v. State Farm Mut. Auto. Ins. Co.*, 484 F.Supp.3d 492, 501 (E.D. Mich. 2020) (noting, in dicta, that it would be plausible for "direct physical loss" to include loss of use if the policy required loss "of" instead of "to" property). The Court finds this argument unpersuasive. Even accepting that "of" and "to" might support different linguistic arguments, to interpret "direct physical loss *of* property" to include any level of loss of use would render "direct" and "physical" superfluous. *See City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986) ("Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible.") Any loss under this Policy must flow from a Covered Cause of Loss, which hinges on direct physical loss. Loss of use in the manner Surgeons alleges is not a *direct physical* loss. Plaintiff's property was accessible and intact at all times, and Plaintiff was able to use its property, even if not fully as intended. *See Santo's Italian Café*, 15 F.4th at 404-5 ("Some courts, it is true, have held that a loss of the ability to use property sometimes may constitute a 'physical loss.' But each case involved property that became practically useless for anything.") To further conclude that loss of use includes loss of *any intended use at all* would simply stretch the plain terms of the Policy too far. Again, *Estes* is instructive here. It analyzed loss "to" property from the owner's reasonable perspective. This included, as an example, theft of property, which the Court cast as loss "of" property. The discussion was about a business income provision turning on loss "to" property. *See Estes*, 23 F.4th at 700. Obviously, *Estes*'s "tangibly deprived of the property" element includes the owner's physical loss of same. The Court sees no significance in the Policy's prepositional choices, which *Estes* used interchangeably.

### d. The Virus and Consequential Losses Exclusions

Alternatively, the Policy virus exclusion would forestall coverage.

The Virus Exclusion provides that "[w]e will not pay for loss or damage caused directly or indirectly by . . . [a]ny virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Policy, Section (I)(B)(1)(j). First, the coronavirus is a virus that is capable of inducing physical distress, illness, or disease—no party disputes this. COVID-19, at least primarily, falls within the categories excluded by this provision. Plaintiff asserts, however, that "[t]he Virus exclusion does not apply because COVID-19 was not the underlying cause of Plastic Surgeons' loss." DE 28 at 18. According to Surgeons, it was not the virus that caused the losses, but the government orders that suspended Surgeons' business. The plain language of the provision excludes coverage when any virus is the *direct or indirect* cause of loss or damage. It is beyond dispute that COVID-19 was the direct, textual catalyst behind the closure decisions. *See* DE 27-6 (noting social distancing mandate "to limit and contain the spread of the COVID-19 infection" and imposing closure "as a consequence"). Indeed, Plaintiff asserts that "[the] Civil Authority orders were taken in response to the threat of and the actual presence of COVID-19 . . . ." DE 28 at 17. Several other courts facing this same question have rejected similar arguments seeking exclusion avoidance. In *1210 McGavock Street Hospitality Partners, LLC v. Admiral Indemnity Company*, the plaintiff insured argued that "the virus exclusion did not apply, because its business loss was due, not to COVID-19, but to a closure order." 509 F.Supp.3d 1032, 1039 (M.D. Tenn. 2020). The court rejected this argument and found that "the clear and unambiguous language of the Virus Exclusion Clause precludes coverage of the plaintiff's claims." *Id.* at 1040;[7] *see also Turek Enterps.*, 484 F.Supp.3d at 503 (rejecting Plaintiff's argument that

---

[7] The policy language here is nearly identical to that in *1210 McGavock Street*: "the Policy excludes coverage for 'loss or damage caused by or resulting from any virus . . . or other

17

virus exclusion did not apply and holding that "[t]he only reasonable conclusion is that the [executive] Order—and, by extension, Plaintiff's business interruption losses—would not have occurred but for COVID-19"); *Newchops Rest. Comcast LLC v. Admiral Indem. Co.*, 507 F.Supp.3d 616, 620–21 (E.D. Pa. Dec. 17, 2020) ("In an attempt to circumvent this exclusion, the insureds argue that the cause of their losses and damages is the shutdown orders, not the COVID-19 virus. This effort fails."); *Mauricio Martinez, DMD, P.A. v. Allied Ins. Co. of Am.*, 483 F.Supp.3d 1189, 1191 (M.D. Fla. 2020) (where the policy at issue contained an exclusion for loss or damage caused "directly or indirectly," by "[a]ny virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease," holding that, because the plaintiff dental practice's damages "resulted from COVID-19, which is clearly a virus, neither the Governor's executive order narrowing dental services to only emergency procedures nor the disinfection of the dental office of the virus is a 'Covered Cause of Loss' under the plain language of the policy's exclusion"); *Franklin EWC, Inc. v. Hartford Fin. Servs. Grp., Inc*, 488 F.Supp.3d 904, 907 (N.D. Cal. Sept. 22, 2020) ("Thus, as the loss was caused directly or indirectly by the virus, the Virus Exclusion applies under its plain and unambiguous language . . . [U]nder Plaintiffs' theory, the loss is created by the Closure Orders rather than the virus, and therefore the Virus Exclusion does not apply. Nonsense."). The single state court case Plaintiff cites in favor of its position cannot overcome this plenitude of persuasive authority. *See* DE 28 at 18. The real-life sequence here is in the heartland of the exclusion.[8]

---

microorganism that induces or is capable of inducing physical distress, illness or disease.'" 509 F.Supp.3d at 1038.

[8] Given the cascading and alternative bases, the Court sees no need to and will not venture into the consequential losses exclusion in Section (I)(B)(2)(b).

## V. Conclusion

The Court determines, on the undisputed facts and upon legal interpretation of the provisions at issue, that the Policy does not cover Plaintiff's claimed losses. There was no "Covered Cause of Loss," no "direct physical loss," within the Policy ambit. The Court **GRANTS** DE 27.

This the 2nd day of March, 2022.

Signed By:
*Robert E. Wier*
United States District Judge